UNITED STATES of America, Appellee,

v.

Antonio YOUNG, Gustavo Hernandez, Federico Manon, Martin Reyes, and Charles Molina, Defendants-Appellants.

Nos. 353, 458, 376, 374 and 375, Dockets 86–1204, 86–1205, 86–1212, 86–1257 and 86–1258.

United States Court of Appeals, Second Circuit.

Argued Jan. 20, 1987.

Decided June 25, 1987.

---

Maurice H. Sercarz, Brooklyn Heights, N.Y. (Sercarz, Schechter & Lopez, of counsel), for defendant-appellant Young.

George W. Harder, Albany, N.Y. (Harder, Silber & Gillen, of counsel), for defendant-appellant Hernandez.

Robert Rivers, Hempstead, N.Y., for defendant-appellant Manon.

Michael A. Feit, Albany, N.Y. (Feit & Schlenker, of counsel), for defendants-appellants Molina and Reyes.

John J. McCann, Asst. U.S. Atty., N.D.N.Y. (Frederick J. Scullin, Jr., U.S. Atty., N.D.N.Y., of counsel), for appellee.

Before LUMBARD, KEARSE and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

This narcotics appeal presents numerous issues, some of which relate to several or all defendants, and some of which relate to only one. We will first address the common arguments, none of which have merit. Then we will address arguments having individual application, one of which requires reversal of the conviction of defendant Federico Manon. As to the other defendants we affirm.

## BACKGROUND

The investigation that led to the arrest and trial of the defendants began in January 1985 when officials of the Drug Enforcement Administration ("DEA") informed the Albany Police Department that an ongoing DEA investigation had implicated Juan George in cocaine transactions. Acting on this information, the Albany police obtained state electronic surveillance orders for George's home and office telephones. After being extended for thirty additional days, these orders expired on March 22, 1985. Based on transcripts of the intercepted conversations, George, his wife Luisa George, Ismael Melendez, Marcos Sarol, Carmen Manon, and the five defendants bringing this appeal were jointly indicted by a federal grand jury on May 15, 1985, on charges of conspiracy to possess with intent to distribute cocaine, 21 U.S.C. § 846, conspiracy to distribute cocaine, 21 U.S.C. § 846, and use of a telephone to facilitate a drug conspiracy, 21 U.S.C. § 843(b).

On June 28, 1985, Judge Miner, then a district judge, denied defendants' pre-trial motions, including a motion to suppress evidence of the intercepted conversations.

Judge Gagliardi began the jury trial on December 2, 1985. Three days later Juan and Luisa George, Ismael Melendez, and Marcos Sarol pled guilty in satisfaction of all counts alleged against them, and on December 9, 1985, all charges against Carmen Manon were dismissed. These events left only the five appealing defendants to continue the trial. On December 13, 1985, the jury convicted these remaining defendants on all counts. Each was sentenced to 60 days imprisonment, 100 hours of community service, and a special assessment of $50. These appeals followed.

## DISCUSSION

A. *Claims Common to Multiple Defendants.*

The defendants join in two common contentions. The first challenges the admissi-

bility of the transcripts of conversations intercepted by the court-ordered wiretaps on the phones of co-conspirator Juan George. The second challenges the lack of any minority persons on the venire from which the defendants' jury was chosen. Neither argument has merit.

### 1. *Admissibility of Wiretapped Conversations.*

Defendants raise two grounds for excluding the intercepted conversations. First, they challenge the adequacy of the affidavits submitted in support of the authorizing orders on the basis that they did not establish that other, normal investigative techniques had been tried or would be futile, as required by 18 U.S.C. § 2518(1)(c). Second, they argue that the federal crimes with which defendants were charged are "offenses other than those specified" in the state wiretap orders and that 18 U.S.C. § 2517(5) therefore required advance judicial approval for use of the wiretaps in the federal grand jury.

### a. *Adequacy of Supporting Affidavits.*

The first ground requires little comment. Defendants argue that the supporting affidavits prepared and submitted to procure the necessary court orders did not show that normal investigative techniques had been tried or were likely to fail. Such a showing is required both by federal law, 18 U.S.C. § 2518(1)(c), and by state law, New York State Criminal Procedure Law, § 700.15(4).

■ The district court, which is entitled to deference, *see United States v. Puglisi,* 790 F.2d 240, 241 (2d Cir.) (*per curiam*), *cert. denied,* — U.S. —, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986), found that the requirements of 18 U.S.C. § 2518(1)(c) were met and refused to suppress the evidence. We see no reason to disturb this decision. A reading of the affidavit submitted by Detective Sergeant Fargione of the Albany Police Department makes clear that in fact several "normal investigative techniques" had been tried unsuccessfully, and that other such techniques were likely to fail. As the affidavit pointed out, surveillance of George's residence would have been impractical, since such surveillance in a residential neighborhood is likely to "be conspicuous and draw attention to the assigned officers." *See United States v. Turner,* 528 F.2d 143, 152 (9th Cir.), *cert. denied,* 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975). Similarly, surveillance of his place of business, an office on the seventh floor at a state office building, would have been unsuccessful, because surveillance of the building from the outside would have given little information regarding who had gone to see George, and for what purpose, and interior surveillance of George's office would have been too conspicuous and highly likely to reveal the fact of an on-going investigation.

Techniques other than direct surveillance would also have been unavailing. The Fargione affidavit stated that there were no informants available to infiltrate an undercover police officer into the conspiracy for the purpose of making a controlled buy. Use of a pen register and acquisition of telephone toll records, neither of which "identify the participants to a telephone conversation", would have been unavailing since they "would be unlikely to uncover [George's] partners in crime". *United States v. Martino,* 664 F.2d 860, 868 (2d Cir.1981), *cert. denied, Miller v. United States,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982). In fact, telephone toll records for George's home phone were pulled for December 1984, but proved useless.

■ While it is true that other techniques, used in combination, might have borne some fruit, there is no requirement "that any particular investigative procedures be exhausted before a wiretap may be authorized". *United States v. Lilla,* 699 F.2d 99, 104 (2d Cir.1983). We have previously noted that "wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation". *United States v. Steinberg,* 525 F.2d 1126, 1130 (2d Cir.1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976).

b. *Corresponding Federal and State Crimes.*

■ Defendants further argue that the intercepted conversations should not have been admitted into evidence because the government failed to comply with the terms of 18 U.S.C. § 2517(5), which requires judicial approval before wiretap evidence can be used in a criminal or grand jury proceeding relating to offenses other than those specified in the initial wiretap order. Section 2517(5) provides:

> When an investigative or law enforcement officer, while engaged in intercepting wire, oral, or electronic communications in the manner authorized herein, intercepts wire, oral, or electronic communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may * * * be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter.

Defendants contend that the federal charges on which they were tried were "other offenses" from the state law offenses described in the original wiretap order, and that judicial approval was therefore necessary before the evidence could be used against them in the instant federal prosecution. We reject defendants' contention, because the federal offenses charged were not "other offenses" within the meaning of the statute. It is therefore unnecessary to consider whether, as the government alternatively contends, it was sufficient to obtain the judicial approval prior to defendants' trial, but after they had been indicted by the grand jury.

The state-law crimes for which the wiretap authorization was sought were identical to the federal crimes for which defendants were indicted and convicted. The district attorney's applications for wiretaps on George's business and home telephones alleged "probable cause to believe that JUAN J. GEORGE and others yet unknown * * * are committing and are about to commit offenses involving sale of and possession with intent to sell controlled substances, attempt to and/or conspiracy to commit those offenses and use of a telephone to facilitate the commission of those offenses, in violation of Articles 220, 110 and 105 of the Penal Law of the State of New York", and it was for a violation of those sections that County Judge Joseph Harris found sufficient probable cause to justify issuance of the wiretap orders. The state Penal Law sections, of course, correspond exactly to the federal offenses of which defendants were convicted.

■ Where the only difference between the offenses described in the wiretap authorization and those for which defendants are indicted is that the former are state offenses and the latter are federal offenses, we hold that they are not "other offenses" within the meaning of § 2517(5). Thus, as to substantially identical offenses—ones described in the same language and containing the same essential elements—subsequent judicial authorization is unnecessary.

■ We agree with the view of the first circuit in *United States v. Smith,* 726 F.2d 852, 864–66 (1st Cir.1984) (in banc), that this holding raises no possibility of "subterfuge searches" and will neither frustrate the purpose nor undermine the effects of the statute. Indeed, we perceive our holding as less an exception to, than a definition of, the phrase "other offenses". The purpose of § 2517(5) is to prevent "subterfuge searches", which involve "the government [using] a warrant authorizing seizure of one type of evidence as a license to collect evidence of an offense not covered by the authorization." *Smith,* 726 F.2d at 865. *See* S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S. Code Cong. & Ad. News 2112, 2188–89. This goal is in no way compromised by allowing the use of conversations intercepted via a wiretap authorized upon the showing of probable cause to believe that there exists a violation of state law, the elements of which do not in any meaningful way differ from the corresponding federal crimes.

### 2. *Lack of Minority Persons on the Venire.*

Defendant Manon, in a claim joined in by his fellow defendants, argues that the venire from which the trial jury was chosen was not comprised of a representative cross-section of the community, in violation of 28 U.S.C. § 1861 and the sixth amendment of the constitution.

█ As to defendants' statutory challenge, the attack on the all-white venire was neither timely nor in compliance with the requisite procedures set forth in the statute. By its terms, the Jury Selection Act requires that challenges to venires be raised "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of due diligence, the grounds therefor". 28 U.S.C. § 1867(a). It is undisputed that no objection was made to the composition of the jury panel until after the selection process had commenced. Moreover, even though a list of the prospective jurors from which the venire was assembled had been available for three months prior to trial, the defendants made no attempt to procure it.

█ Even if we were to consider the objection as timely raised, it is clear that defendants did not comply with other procedural requirements of the act. Section 1867(d) requires that the objection be raised by written motion, along with a written "sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions" of the act. 28 U.S.C. § 1867(d). No such sworn statement was submitted until Manon's post-verdict motion for dismissal.

█ Although it bars them from statutory relief, defendants' failure to comply with the provisions of the Jury Selection Act does not preclude them from raising a constitutional challenge to the makeup of the venire, based on the sixth amendment. It does not appear that any defendant other than Antonio Young, and he only by reference to the argument he presumes, incorrectly, defendant Manon to have made, has directly raised the sixth amendment issue. However, even if we were to read all defendants' challenges based on the Jury Selection Act as also raising the constitutional issue, we would find that no constitutional violation has been established.

█ *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979), sets forth a three-part test for establishing a *prima facie* violation of the fair-cross-sectional requirement of the sixth amendment:

> [T]he defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Assuming that the first two parts of defendants' *prima facie* case have been established, we nevertheless reject defendants' claim because it is clear that the jury selection system employed in the Northern District of New York does not result in "systematic exclusion of [blacks and hispanics] in the jury-selection process." *Id.* Venires in the northern district are comprised of voters randomly chosen and placed in a master jury wheel. From this group, a "qualified jury wheel" is created, consisting of those who complete and return qualification forms sent, at random, to the individuals in the master wheel. Finally, from the qualified jury wheel the clerk of the court, again randomly, selects the jury panels to serve at any particular session of the court. Thus, all parts of the process are done by random selection.

"The use of voter registration lists as the sole source of the names of potential jurors is not constitutionally invalid, absent a showing of discrimination in the compiling of such voter registration lists." *United States v. Gordon,* 493 F.Supp. 814, 820–21 (N.D.N.Y.1980), *aff'd,* 655 F.2d 478 (2d Cir. 1981). Defendants, however, have not even attempted to establish discrimination with respect to the voter registration lists

used here. In short, defendants have made no showing that any part of the process of selecting the venire was tainted by discrimination, and have therefore failed to establish a *prima facie* violation of their sixth amendment right to a cross-sectional jury panel.

B. *Claims of Individual Defendants: Sufficiency of the Evidence.*

Each defendant claims there was insufficient evidence to support his conviction. We agree that the government introduced insufficient evidence to sustain the conviction of defendant Federico Manon. However, sufficient evidence was adduced to support the convictions of Gustavo Hernandez, Martin Reyes, Antonio Young, and Charles Molina.

1. *Federico Manon.*

■ The evidence as to defendant Federico Manon was insufficient. In the main, the government's evidence consisted of the fact that Manon had lent Juan George $200 on February 14, 1985. At best, the government established only that Manon did not inquire as to the reason George requested the money; the government makes no plausible argument, and introduced no evidence at trial, that Manon actually knew that George intended to use the money to purchase cocaine.

The conversation wherein Manon agreed to lend George the $200 reveals no basis to infer knowledge on Manon's part that the money was to be used for cocaine:

JUAN [GEORGE]: I need a few dollars ... a few hundred dollars.

FEDERICO [MANON]: How much?

JUAN: Two hundred.

FEDERICO: Okay, I'll go to the bank and get it.

JUAN: You would[?].

FEDERICO: Hey, that's what friends are for.

\* \* \* \* \* \*

JUAN: But I need it tomorrow \* \* \* because I have to get something from New York.

FEDERICO: You don't have to explain it.

JUAN: No, but ...

FEDERICO: You don't have to.

Govt. Ex. 53B. This conversation was insufficient to prove beyond a reasonable doubt that Manon knew that George intended to purchase cocaine with the loan; indeed, the only reasonable conclusion is that he didn't feel a need for an explanation, and whatever the purpose was willing to extend the loan on the basis of his friendship with George.

■ The only evidence other than the loan itself pointed to by the government as supporting Manon's conviction goes only to a possible inference that Manon had some knowledge that George was involved in a conspiracy to possess and distribute cocaine. Even if such an inference could reasonably be drawn from the evidence adduced, mere knowledge of a conspiracy does not render the individual with such knowledge a co-conspirator. Having knowledge that an individual is involved in a drug conspiracy does not mean that lending the individual money—at least when the sum involved is not so great as to raise an inference that the loan must be or very likely is to be used in the conspiracy—involves the lender in the conspiracy. Since the $200 loan made by Manon to George, even when combined with the possible inference that Manon was aware that George was involved in a narcotics conspiracy, was insufficient to support the conclusion that Manon was a co-conspirator, his conviction cannot stand.

2. *Gustavo Hernandez, Martin Reyes, Antonio Young, and Charles Molina.*

The evidence that the remaining four defendants were involved in a conspiracy with Juan George to distribute cocaine is far more compelling, and readily sufficient to sustain their convictions.

■ As to defendant Gustavo Hernandez, the government's evidence, consisting mainly of the testimony of conspirator Ismael Melendez, was that Hernandez not only purchased cocaine for his own person-

al use, but also supplied it to someone at an Albany pub, and, more importantly, also delivered cocaine to Juan George, who then paid Ismael Melendez for the cocaine. Such involvement in both the distribution and delivery of the cocaine is sufficient to permit the inference that Hernandez was both aware of the broad conspiracy, and a participant in its functioning. *United States v. Torres*, 503 F.2d 1120, 1123–24 (2d Cir.1974).

■ There was also sufficient evidence for the jury to conclude that defendant Antonio Young participated in the conspiracy to distribute cocaine. While it is true that a mere purchaser of cocaine for personal use is not a co-conspirator in his suppliers' distribution conspiracy, *cf. United States v. Swiderski*, 548 F.2d 445, 451 (2d Cir.1977) ("[One] who delivers drugs to [another] is liable as a distributor * * * while [one] who receives the drug for personal use[] is subject to a charge of simple possession * * * unless it is proven * * * that the user intends further to distribute the substance."), there was evidence that Young did take acts to "further distribute" the cocaine he purchased from George, and moreover participated in George's operation, if only to a limited extent. In one instance, Young purchased cocaine to supply to guests he was expecting, and at another point he relayed the complaint of another of George's customers that George was "cutting", or diluting, the cocaine. These acts may be analogized to the functions in a legitimate business of a sales or customer service agent giving "free samples" and relaying customer criticisms, and the jury could reasonably conclude that they manifested Young's participation in the George narcotics enterprise.

■ The evidence also was sufficient to support the convictions of Molina and Reyes. On at least one occasion, Molina purchased cocaine from George for the purpose of distributing it to his co-workers "to keep them awake". In addition, the government introduced as evidence the transcript of a conversation between Molina and Juan George in which they discussed, using coded terminology, the price

and availability of cocaine. Based on this explicit distributive conduct, and the interpretation of the conversation offered by an Albany police officer, the jury could reasonably conclude that Molina was actively involved in George's conspiracy.

■ The evidence is most convincing as to defendant Reyes. Reyes not only purchased cocaine from Juan George, but also offered to introduce George to Reyes' brother-in-law as a potential new supplier of cocaine. Moreover, in contrast to Manon, who merely lent George money without knowing the purpose to which he would apply it, Reyes specifically offered George money if George required it for the purchase of cocaine. This activity was sufficient to support the conclusion that Reyes was a member of the George conspiracy.

We therefore conclude that as to defendants Gustavo Hernandez, Martin Reyes, Antonio Young, and Charles Molina, there was sufficient evidence, when viewed in the light most favorable to the government, to support their convictions.

CONCLUSION

In sum, we reverse the conviction of, and dismiss the indictment against, defendant Federico Manon on the basis that there was insufficient evidence to convict him of conspiracy in violation of 21 U.S.C. § 846 and § 843(b). We affirm the convictions of defendants Gustavo Hernandez, Martin Reyes, Antonio Young, and Charles Molina, having rejected their common challenges to the admissibility of wiretap evidence and to the lack of minority persons on the venire from which their jury was chosen, and their individual challenges to the sufficiency of the evidence supporting their convictions. We have considered the remaining contentions advanced by these defendants and find them to be without merit.

Nos. 86–1205, 86–1212, 86–1257, and 86–1258 are affirmed. No. 86–1204 is reversed and the indictment therein is dismissed.